## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (GREENBELT DIVISION)

| | | |
|---|---|---|
| **DEBRA'S GLASS, INC.** | : | |
| 255 North Pleasant Ave | : | |
| Dallastown, PA 17313 | : | **CIVIL ACTION NO.  8:22-cv-01055** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **HENSEL PHELPS CONSTRUCTION CO.** | : | |
| 420 6th Ave, | : | |
| Greeley, CO 80631 | : | |
| | : | |
| **Serve:** | : | |
| **Hensel Phelps Construction Co.** | : | |
| **420 6th Ave,** | : | |
| **Greeley, CO 80631** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## COMPLAINT

Plaintiff, Debra's Glass, Inc. ("DGI"), by and through undersigned counsel, hereby files this Complaint against Defendant Hensel Phelps Construction Co. ("Hensel Phelps") and in support thereof avers as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) over the causes of action against Hensel Phelps and because the amount in controversy exceeds $75,000, and the parties are all citizens of different states.

2.      Venue is proper in this District pursuant to 40 U.S.C. § 3133(b)(3), as this is the District in which the subject construction project is located and in which the subcontract work described below was performed.

## PARTIES

3.      Plaintiff Debra's Glass is a Pennsylvania corporation with its principal place of business located at 255 North Pleasant Ave, Dallastown, PA 17313.

4.      Debra's Glass is registered to do business in the State of Maryland.

5.      Hensel Phelps is a Colorado corporation with a principal place of business located at 420 6th Ave, Greeley, CO 80631, and is licensed to do business and regularly conducts business in the State of Maryland.

## FACTS

**General Background**

6.      On or about November 12, 2020, DGI entered into a subcontract agreement with Hensel Phelps (the "Subcontract"), by which DGI agreed to, *inter alia*, provide labor and materials to install various metal panels as part of a construction project for the construction of an NIH Alzheimer's Temporary Research Facility in Bethesda, Maryland (the "Project"). A true and correct copy of the Subcontract is attached hereto as **Exhibit A**.

7.      The base Subcontract amount was $461,413.

8.      As part of its Subcontract, DGI supplied metal panels and related materials necessary for installation of the panels that it purchased from the panel manufacturer, Morin Corporation ("Morin").

9.      The Subcontract also requires DGI to provide a warranty for work and materials it provides to the Project.

10.     Upon information and belief, the buildings upon which DGI was to install the metal panels were prefabricated buildings provided by a modular building company.

11.     The "Owner" of the Project is the federal government, specifically The National Institutes of Health ("NIH").

2

12.     Upon information and belief, Hensel Phelps entered into a prime contract with NIH to complete all of the work associated with the new construction of the NIH Alzheimer's Research Facility (the "Prime Contract").

13.     In addition to the Subcontract's multiple articles and provisions regarding scope, price, changes, etc., the Subcontract also incorporates flow-thru of various Federal Acquisition Regulations ("FAR") clauses, rights, obligations, and remedies of the Prime Contract.

14.     In particular, Sections 52.236-2 and 52.243-4 of the FAR are incorporated into the Subcontract and apply to this Project.

15.     FAR 52.236-2(a) states that a subcontractor must promptly give written notice to the Contracting Officer (or, as here, the design-build contractor) of any "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract" or of any "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract."

16.     Moreover, any "written or oral order…from the Contracting Officer that causes a change shall be treated as a change order" so long as the subcontractor gives written notice stating the date, circumstances, and source of the order. FAR 52.243-4(b).

17.     Upon information and belief, as the design-build prime contractor, Hensel Phelps, upon written notice of the above, is required to investigate the site conditions, and in cooperation with the Owner increase the subcontract cost where the conditions do materially differ. FAR 52.236-2(b).

**Deficiencies Discovered Regarding the Walls on the Project and Hensel Phelps' Failure to Pay DGI**

18.     DGI timely mobilized to the Project site on August 16, 2021, to sort and inventory material deliveries, perform layouts, and begin the steel girt framing installation on the pre-fabricated buildings.[1]

19.     However, on August 19, 2021, DGI discovered deficiencies with the exterior walls, which were out of alignment, and immediately notified Hensel Phelps in writing.

20.     Specifically, the framing substrate of the pre-fabricated buildings upon which DGI was to attach its metal panels and panel support system was out of alignment (i.e., not true, and plumb as required by Contract documents), and further, was contrary to the metal panel manufacturer's requirements for proper and warrantable installation.

21.     As it existed, the substrate would not support the required design-compliant, contract-compliant, and manufacturer-compliant installation of metal panels by DGI, and was a changed condition.

22.     Upon information and belief, Hensel Phelps, as the design-build contractor, was responsible for providing a sufficient design, and to the extent there were design deficiencies, was responsible for providing a corrective design solution.

23.     DGI fulfilled its contractual obligations as, upon discovering the changed condition, DGI promptly informed Hensel Phelps of the issues with the out-of-alignment and otherwise inadequate substrate.

24.     Hensel Phelps determined that this out-of-alignment finding had merit, and upon receipt of the DGI notification, directed DGI on or about August 26, 2021 to suspend work while

---

[1] A "girt" is a horizontal structural support that spans between columns or posts in framed construction and is used to support exterior features such as cladding or panels.

Hensel Phelps conducted an engineering survey (the "Survey") of the structure to measure the extent of the out-of-alignment condition of the exterior walls.

25.     DGI received the Survey results from Hensel Phelps on September 16, 2021, approximately three weeks following the DGI finding and notification of the conditions.

26.     The Survey confirmed that the framed exterior walls were out of alignment and deviated from the design, and the Contract's and Manufacturer, Morin's, tolerances and requirements.

27.     This design deficiency operated to prevent proper and Subcontract-compliant installation of the metal panels by DGI.

28.     Again, upon information and belief, Hensel Phelps is the design-builder for this Project and therefore has responsibility for both the design and build of this Project.

29.     As a Project subcontractor, DGI has no design responsibilities or delegation of design obligations.

30.     DGI is only responsible for installing materials in compliance with the "approved" design of record.[2]

31.     Regardless of whether the entity responsible for the design was Hensel Phelps as the design-build contractor, NIH as the Project Owner, or some other entity, this changed condition required an equitable adjustment to the Subcontract, as DGI was not responsible for the Project design in any scenario.

32.     Nonetheless, lacking any design solution from Hensel Phelps, and in efforts to assist Hensel Phelps to expedite a compliant solution to the out-of-alignment deficiency, DGI

---

[2] By way of example, on April 13, 2021, DGI received approval from Hensel Phelps for the structural calculations it submitted for the girt system installation.

requested information from Morin, the panel manufacturer, which proposed an engineered fix involving the use of a two-piece adjustable girt system.

33.     This system would provide adjustments to compensate for the varying deviations in the exterior walls, allowing DGI to install the metal panels properly and in compliance with Morin's requirements and further, supporting the warrantability requirements of the Contract and Subcontract.

34.     As requested by Hensel Phelps, DGI prepared, and on October 22, 2021, DGI submitted a fixed-price change order proposal (Change Order No. 4) to address the change conditions, which Hensel Phelps rejected, stating the costs were too high.

35.     Following the Hensel Phelps rejection of the first DGI Change Order 4 proposal, DGI revised its proposal, and on November 1, 2021 submitted a revised change order proposal, reducing the costs and demonstrating the additional work would cost approximately $90,000. However, Hensel Phelps again rejected the change order, and without justification, explanation or negotiation, stated it would only accept the work on a Time and Material basis.

36.     Hensel Phelps then proceeded to withhold all present and subsequent payments due and owing to DGI.

37.     Hensel Phelps refused to negotiate and approve a change order for the out-of-alignment differing site condition, rejecting the two DGI change proposals submitted that also included the engineered fix provided by Morin.

38.     Instead, Hensel Phelps directed DGI to proceed with the girt and panel installation on a Time & Materials basis, but in doing so Hensel Phelps failed to incorporate or approve a formal design change modification for the change work to be performed.

39.     Hensel Phelps' directive presented DGI with an impossibility of performance, as DGI would then be non-compliant with contract obligations and the manufacturer's warranty, and its own warranty obligations would be void.

40.     On November 8, 2021, Hensel Phelps informed DGI that Hensel Phelps was moving forward with another trade partner, PCC Construction Components, Inc. ("PCC"), to install the metal panel sub-girt framing, and that it still wanted DGI to perform the installation of the metal panels.

41.     Hensel Phelps estimated that the sub-girt framing would be installed and ready for metal panel installation by November 22, 2021.

42.     On November 14, 2021, DGI visited the Project site to observe PCC installing the girt systems; however, no engineering fix was being performed.

43.     Moreover, DGI observed that PCC was installing the steel girt system at four times the contract-required amount and spacing, contrary to the manufacturer's requirements and directions, and at substantially more labor and material costs than the contract design required.

44.     DGI informed Hensel Phelps of these conditions and incorrect spacing of the girt system being installed both verbally and in writing.

45.     HP never presented DGI with this design modification option, or with any formal acceptance of the aforementioned manufacturer's solution when it requested DGI's change proposals, or when Hensel Phelps subsequently, following its rejection of those change proposals, directed DGI to proceed on a Time & Materials basis.

46.     However, Hensel Phelps nonetheless directed PCC to install the girt system using four times the contract-required materials and altered spacing of that system, as observed, constituting a new, modified design installation that Hensel Phelps never provided to DGI.

47.     At all times during the Project, DGI was ready, willing, and able to perform the original scope of work set forth in its Subcontract when called upon to do so by Hensel Phelps.

48.     DGI's material supplier, Morin, has demanded payment from DGI for the materials used in PCC's installation.

49.     DGI again mobilized to the Project to install the metal panels on December 1, 2021, based upon Hensel Phelps' directives and its representations that any deficiencies in the girt installation were resolved and that the Project was ready for the metal panels.

50.     However, when DGI returned to the site, DGI discovered again that the girt system as installed did not provide a proper engineered fix to the out-of-alignment conditions necessary to allow the panels to be installed flush, without gaps, as required by the contract, the manufacturer's requirements, and warranty provisions.

51.     Among other issues, DGI observed that there was no shimming performed on the girts to bring them to the specification standards required for panel installation.

52.     As a further example of PCC's improper installation, when PCC installed DGI's girt material, it also failed to remove and clean up its metal shavings, which caused rust stains and discoloration.

53.     Owing to the design deficiencies, associated delays, and unforeseen, differing site conditions, DGI timely submitted change orders for additional materials and costs, including additional metal panels, additional coping changes due to the wall substrate issues, and for material escalation costs—all of which are beyond the scope of the contract design drawing and specifications.

54.     Despite the fact that Hensel Phelps acknowledged and confirmed via its own engineered Survey it conducted that the out-of-alignment condition of the exterior walls

constituted a changed and differing site condition, Hensel Phelps failed to provide a design solution to DGI, failed to negotiate and approve DGI's change orders, and failed to provide and/or negotiate an equitable adjustment to DGI.

55.    Moreover, despite Hensel Phelps' failures, on January 12, 2022, Hensel Phelps provided notice to DGI that Hensel Phelps was placing DGI in default and was supplementing DGI's obligations under the Subcontract.

56.    Hensel Phelps now claims that the costs PCC expended to perform DGI's work total in excess of one million dollars, despite the fact that (i) DGI's initial proposed costs for the additional material and work itself only amounted to $162,263.15 (and a subsequent proposal was even less), which is significantly less than the costs allegedly expended by PCC; (ii) Hensel Phelps evidently provided PCC a changed design requirement that it did not provide to DGI, which substantially increased the labor and materials needed by PCC to perform the girt installations, increasing that work to approximately four times the as-contracted requirements, and (iii) the changed design by Hensel Phelps upon which PCC has evidently installed this work does not meet specification and manufacturer requirements and warranty obligations.

57.    To date, DGI has provided $347,952.25 in materials to the Project, but only has received payment for $227,320.

58.    Hensel Phelps owes DGI an outstanding balance of $180,752.72 for the materials DGI supplied to the Project.

59.    A portion of that balance, $68,088, was previously approved by Hensel Phelps in or around September 2021.

60.     Furthermore, DGI is entitled to extended overhead costs, in excess of approximately $102,000, for the period from when Hensel Phelps directed DGI to stop work on August 26 until January 12, 2022 when Hensel Phelps notified DGI that it was placed in default.

61.     DGI has made repeated requests for payment, but Hensel Phelps has refused to pay based on its contention that DGI must pay for the installation work performed by PCC.

62.     Upon information and belief, Hensel Phelps has been paid by the Owner for the materials provided by DGI for which payment is still owed.

**COUNT I**
**BREACH OF CONTRACT**

63.     DGI incorporates by reference the foregoing paragraphs as if fully set forth herein.

64.     The Subcontract between Hensel Phelps and DGI is a valid and enforceable contract.

65.     Hensel Phelps breached the Subcontract by, among other things:

    a.   failing to coordinate the design;

    b.   failing to be responsible for its design obligations and to effect appropriate changes to that design as change conditions present and require;

    c.   failing to remit payment for work performed;

    d.   failing to remit timely payments; and

    e.   failing to properly and timely process change orders, thereby failing to comply with the "Changes" and "Differing Site Conditions" clause of the Contract.

66.     As a direct and proximate result of Hensel Phelps' material breaches of the Subcontract, DGI has suffered damages in an amount not less than $282,752.72.

67.     DGI made multiple demands to Hensel Phelps for payment.

68.     Despite such demands for payment, Hensel Phelps has failed and/or refused to pay DGI.

69.     All conditions precedent to payment have occurred, been performed, and/or were waived.

70.     All conditions precedent to bringing suit have occurred, been performed, and/or were waived.

71.     WHEREFORE, Plaintiff, DGI, requests judgment in its favor and against Defendant Hensel Phelps in an amount to be determined at trial and in excess of $282,752.72 plus pre- and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems just and proper.

## COUNT II
## IN THE ALTERNATIVE, UNJUST ENRICHMENT

72.     DGI incorporates by reference the foregoing paragraphs as if fully set forth herein.

73.     Alternatively, to the extent that the Subcontract, or any modifications, alterations, or additions thereto, are deemed unenforceable or invalid, or the labor and materials comprising the extra work and costs contained in DGI's change orders are determined to not be part of the Subcontract, DGI conferred a benefit on Hensel Phelps by providing valuable labor and materials on the Project at the request of Hensel Phelps, fully expecting compensation from Hensel Phelps for such services.

74.     Hensel Phelps had knowledge and enjoyment of the benefit of the labor and materials provided by DGI.

75.     Hensel Phelps failed to pay DGI for the labor and materials used in performing its work on the Project.

76.     Hensel Phelps's retention of the benefits of the labor and materials provided by DGI without compensating DGI would be unjust.

77.     The value of the benefit of the labor and materials furnished is in excess of $282,752.72.

WHEREFORE, Plaintiff, DGI, requests judgment in its favor and against Defendant Hensel Phelps in an amount to be determined at trial and in excess of $282,752.72 plus pre- and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems just and proper.

## COUNT III
## VIOLATION OF MARYLAND PROMPT PAYMENT ACT, MD Code Ann. Real Prop. § 9-301 *et seq.*, AND CLAIM FOR ATTORNEYS' FEES

78.     DGI incorporates by reference the foregoing paragraphs as if fully set forth herein.

79.     Section 9-302(b)(3) of the Maryland Prompt Payment Act (MD Code Ann. Real Prop. § 9-301 et seq. – "Prompt Payment Act") provides that:

. . . the contractor or subcontractor shall pay undisputed amounts owed to its subcontractors within 7 days after receipt by the contractor or subcontractor of each payment received for its subcontractor's work or materials.

80.     Hensel Phelps is a "Contractor" within the meaning of the Prompt Payment Act.

81.     DGI is a "Subcontractor" within the meaning of the Prompt Payment Act.

82.     Upon information and belief, Hensel Phelps received payment from the Owner for work performed by DGI, but Hensel Phelps failed to pay DGI within seven (7) days after receipt of such payment, in violation of the Prompt Payment Act.

83.     Hensel Phelps's refusal to pay DGI for the labor, materials, and services which DGI provided in connection with the Project violates the terms of the Prompt Payment Act, entitling DGI to interest, reasonable costs, and attorneys' fees.

84.     DGI seeks the recovery of attorneys' fees under the Prompt Payment Act.

85.     These damages will continue to accrue during the pendency of this action.

WHEREFORE, Plaintiff, DGI, requests judgment in its favor and against Defendant Hensel Phelps in an amount to be determined at trial and in excess of $282,752.72 plus pre- and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems just and proper.

Date: April 29, 2022                          **COHEN SEGLIAS PALLAS**
                                              **GREENHALL & FURMAN PC**

                                              _____
                                              Jackson S. Nichols
                                              Dist. Md. Bar No. 19689
                                              George E. Pallas
                                              (*Pro Hac Vice to be filed*)
                                              900 Seventh Street, NW
                                              Suite 725
                                              Washington, DC 20001
                                              202-466-4110 (tel)
                                              202-466-2693 (fax)
                                              jnichols@cohenseglias.com

                                              *Counsel for Plaintiff,*
                                              *Debra's Glass, Inc.*

13